# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. **14 - 20301** CR-MORENO

18 U.S.C. § 1349
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1035(a)(1),(2)
18 U.S.C. § 2
18 U.S.C. § 982

JOHN J. O'SULLIVAN



FILED by ___ D.C.

MAY 06 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

vs.

ANNARELLA GARCIA
and
ANNILET DOMINGUEZ,

　　　　　　　Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

#### The Medicare Program

1.　　The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled.  Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS").  Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2.　　Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3.      "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.      Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs.  CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States.  In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims.  As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

### Reimbursements

6.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

a.     the patient was confined to the home, also referred to as homebound;

b.     the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.  If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence.  There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8.     In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered.  At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made.  As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm.  Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12.     Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency.  The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor.  The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees.  However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13.     For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary.  Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA.  The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home

health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA.  These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## The Defendants and Related Companies

15.     Professional Medical Home Health LLC ("Professional Home Health") was a Florida limited liability corporation incorporated on or about August 3, 2006, that did business in Miami-Dade County, Florida, as an HHA that purportedly provided home health care services to eligible Medicare beneficiaries.  On or about December 30, 2008, Professional Home Health obtained its Medicare provider number, which authorized Professional Home Health to submit claims to Medicare for HHA-related benefits and services.

16.     **ANNARELLA GARCIA**, a resident of Miami-Dade County, was an owner and operator of Professional Home Health.

17.     **ANNILET DOMINGUEZ**, a resident of Miami-Dade County, served as the administrator and alternate administrator of Professional Home Health.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

1.      Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around December 2008, through in or around at least February 2014, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### ANNARELLA GARCIA
### and
### ANNILET DOMINGUEZ,

did knowingly and willfully combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

### PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) offering and paying kickbacks and bribes to Medicare beneficiaries in exchange for the use of their Medicare beneficiary numbers to file claims for home health care; (b) submitting and causing the submission of false and fraudulent claims to Medicare; (c) concealing of the submission of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment and receiving

of kickbacks; and (d) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4.      **ANNARELLA GARCIA** offered kickbacks to patient recruiters in return for recruiting Medicare beneficiaries to be placed at Professional Home Health so that Professional Home Health could bill Medicare for home health services that were not medically necessary and not provided.

5.      **ANNARELLA GARCIA, ANNILET DOMINGUEZ**, and their co-conspirators caused patient documentation to be falsified to make it appear that Medicare beneficiaries qualified for and received the home health services billed to Medicare.

6.      **ANNARELLA GARCIA, ANNILET DOMINGUEZ**, and their co-conspirators filed and caused to be filed false and fraudulent claims with Medicare seeking payment for the costs of home health services that were not medically necessary and not provided.

7.      As a result of these false and fraudulent claims, **ANNARELLA GARCIA, ANNILET DOMINGUEZ**, and their co-conspirators caused Medicare to pay approximately $5,900,000 to Professional Home Health.

8.      **ANNARELLA GARCIA, ANNILET DOMINGUEZ** and their co-conspirators transferred, and caused to be transferred, the fraud proceeds to themselves and companies they controlled, and used the proceeds to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i))

On or about the date specified below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

### ANNARELLA GARCIA,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, as set forth below:

| Count | Approximate Date of Transaction | Description of Financial Transaction |
|-------|---------------------------------|--------------------------------------|
| 2 | August 15, 2012 | The cashing of Professional Medical Home Health LLC check # 3836 in the approximate amount of $3,360. |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT 3
**False Statements Related to Health Care Matters**
**(18 U.S.C. § 1035(a)(1),(2))**

On or about February 6, 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANNILET DOMINGUEZ,**

in any matter involving a health care benefit program, knowingly and willfully falsified, concealed and covered up by any trick, scheme, and device a material fact, and made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, that is, the defendant knowingly used a discharge evaluation form for beneficiary E.G., which form falsely stated that E.G. had been evaluated at the time of discharge, when in truth and in fact, and as the defendant then and there well knew, the beneficiary E.G. had not been evaluated at the time of discharge, in violation of Title 18, United States Code, Sections 1035(a)(1),(2) and 2.

## COUNT 4
**False Statements Related to Health Care Matters**
**(18 U.S.C. § 1035(a)(1),(2))**

On or about February 6, 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANNILET DOMINGUEZ,**

in any matter involving a health care benefit program, knowingly and willfully falsified, concealed and covered up by any trick, scheme, and device a material fact, and made any materially false, fictitious, and fraudulent statements and representations, and made and used any

materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, that is, the defendant knowingly used a discharge evaluation form for beneficiary J.H., which form falsely stated that J.H. had been evaluated at the time of discharge, when in truth and in fact, and as the defendant then and there well knew, the beneficiary J.H. had not been evaluated at the time of discharge, in violation of Title 18, United States Code, Sections 1035(a)(1),(2) and 2.

## COUNT 5
**False Statements Related to Health Care Matters**
**(18 U.S.C. § 1035(a)(1),(2))**

On or about February 6, 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

### ANNILET DOMINGUEZ,

in any matter involving a health care benefit program, knowingly and willfully falsified, concealed and covered up by any trick, scheme, and device a material fact, and made any materially false, fictitious, and fraudulent statements and representations, and made and used any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, that is, the defendant knowingly used a discharge evaluation form for beneficiary S.V., which form falsely stated that S.V. had been evaluated at the time of discharge, when in truth and in fact, and as the defendant then and there well knew, the beneficiary S.V. had not been evaluated at the time of discharge, in violation of Title 18, United States Code, Sections 1035(a)(1),(2) and 2.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982)

1.     The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.     Upon conviction of Counts 1, 3, 4, and 5 of this Indictment, the defendants, **ANNARELLA GARCIA** and **ANNILET DOMINGUEZ**, shall forfeit to the United States all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

3.     Upon conviction of Count 2 of this Indictment, the defendant, **ANNARELLA GARCIA**, shall forfeit to the United States any property real or personal, involved in the offense, or any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1).

4.     The property subject to forfeiture includes but is not limited to approximately $5,917,892 in United States currency, which sum represents the approximate gross proceeds of the charged offense.

5.     If any of the property described above, as a result of any act or omission of the defendants **ANNARELLA GARCIA** and **ANNILET DOMINGUEZ**:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States of America to seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 982(a)(1),(7), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code, Section 982(b).

A TRUE BILL

FOREPERSON _____

WIFREDO A. FERRER
UNITED STATES ATTORNEY

GEJAA GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

A. BRENDAN STEWART
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

-13-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

ANNARELLA GARCIA, et al.,

                    Defendants.
                                  /

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY***

**Court Division:** (Select One)

| | | |
|---|---|---|
| X | Miami | ___ Key West |
| ___ | FTL | ___ WPB   ___ FTP |

New Defendant(s)         ___      No  ___
Number of New Defendants ___
Total number of counts   ___

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:      (Yes or No)        YES
     List language and/or dialect        Spanish

4.   This case will take   7   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

                (Check only one)                                (Check only one)

| I    | 0 to 5 days    |     | Petty    |     |
|------|----------------|-----|----------|-----|
| II   | 6 to 10 days   |  X  | Minor    |     |
| II   | 11 to 20 days  |     | Misdem.  |     |
| IV   | 21 to 60 days  |     | Felony   |  X  |
| V:   | 61 days and over |   |          |     |

6.   Has this case been previously filed in this District Court?   (Yes or No)        No
If yes:
Judge: _____        Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?        (Yes or No)        No
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____        District of _____

Is this a potential death penalty case? (Yes or No)        No

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?        _____ Yes        X        No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?        _____ Yes        X        No

_____
for A. BRENDAN STEWART
TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE
SDFL Court ID No. A5501801

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: ANNARELLA GARCIA

**Case No**: _____

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:      Ten (10) years' imprisonment

Count #: 2

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\*Max. Penalty:**      Twenty (20) years' imprisonment

Count #:

_____

_____

**\*Max. Penalty:**

Count #:

_____

_____

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** ANNILET DOMINGUEZ

**Case No:** _____

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:     Ten (10) years' imprisonment

Counts #: 3-5
False Statements Related to Health Care Matters

Title 18, United States Code, Section 1035(a)(1),(2)

**\*Max. Penalty:**     Five (5) years' imprisonment as to each count

Counts #:

_____

_____

**\*Max. Penalty:**

Count   #:

_____

_____

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**